Filed 9/26/23  Jarecki v. Zitter CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOHN F. JARECKI, JR., as Trustee, etc., et al. | D078314 |
| Plaintiffs and Appellants, | (Super. Ct. No. 37-2013-00032976-CU-MC-CTL) |
| v. | |
| EDWARD ZITTER, as Trustee, etc., et al. | |
| Defendants and Appellants. | |

APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed as modified.

The McMillan Law Firm and Scott A. McMillan for Plaintiffs and Appellants.

Horvitz & Levy, Bradley S. Pauley, Shane H. McKenzie, Lacey L. Estudillo; Law Office of Michael E. H. Anderson and Christopher J. Lee for Defendants and Appellants.

INTRODUCTION

This appeal arises from a drainage dispute between John and Maria Jarecki and their downslope neighbors, Edward and Judith Zitter.  To limit

flooding from the Jarecki property, Edward built a wall and cut a six-inch drainage gap in an existing wall to the east. The Jareckis experienced some ponding in the southwest corner of their lot when it rained, as well as moss growth. This ponding in the corner—with a maximum depth of one-and-a-quarter inches—prompted what has now been a decade of legal proceedings.

After filing suit for nuisance, the Jareckis learned the wall's underground footing encroached a few inches onto their property, and believed Edward Zitter had moved a property marker. They added a cause of action for trespass. They also made a Code of Civil Procedure section 998 offer, which the Zitters did not accept.[1]

The case proceeded to a jury trial, and a bench trial on equitable relief. At the jury trial, the Jareckis claimed intentional trespass based on the wall construction and marker movement, which the jury rejected, and nuisance based on the ponding, which it found. The jury also found that Edward Zitter had engaged in malicious and oppressive conduct. It awarded $25,000 in economic damages based on diminution of property value, $4,355 in noneconomic damages, and $100,000 in punitive damages. At the bench trial, the court ruled that drilling holes in the wall would abate the nuisance.

The Zitters moved for a new trial on punitive damages, which the trial court said it would grant unless the Jareckis accepted a remittitur to $32,000; they did. The Zitters also moved for judgment notwithstanding the verdict (JNOV) to strike diminution damages based on the abatement finding, which the court granted. They successfully moved to tax expert costs based on the

---

[1]     Further statutory references are to the Code of Civil Procedure, unless otherwise noted. Rule references are to the California Rules of Court.

2

invalidity of the section 998 offer, as well.  The Jareckis unsuccessfully moved for costs of proof.

Both parties appeal.  The Zitters contend the record does not support punitive damages.  The Jareckis argue the Zitters' post-trial motions (and thus their appeal) were untimely; punitive damages should not have been reduced; and the trial court erred by striking diminution damages, ruling their section 998 offer was invalid, and denying costs of proof.  We conclude the Zitters' motions and appeal were timely, and there was no substantial evidence for punitive damages.  We reject the Jareckis' contentions.  The judgment is modified to strike punitive damages; the Jareckis' challenge to the order reducing punitive damages is therefore moot; and the judgment and orders are otherwise affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Underlying Events*[2]

The Jareckis and Zitters have been neighbors since 1994.  The Jarecki lot is directly north of the Zitter lot, and has an area at the eastern side that extends south (i.e., the property line extends west to east, then drops south, then terminates east).  The Jarecki garage is in this area.  The property to the east of both lots was owned by Linda Blasingame, and later by Bill Mellot.

The parties worked on their properties over the years.  Pertinent here, the Jareckis made improvements to their backyard in the 1990's and 2000's,

---

[2]    We limit this background, and subsequent fact sections, to facts necessary to resolve the appeals or provide context.  We omit other matters discussed in the briefs, and reject the Jareckis' claim that the Zitters forfeited their substantial evidence challenge to punitive damages by not addressing "most of the evidence" cited in the Jareckis' opening brief.  The Zitters covered the material facts.

including adding concrete "hardscape." In 1996, Edward Zitter added cinder blocks to an existing retaining wall to limit mud flow. John Jarecki contacted the County of San Diego, which sent inspectors and a stop-work notice advising Edward that permits were required. Later in 1996, Edward replaced a fence next to the Blasingame lot with a wall consisting of a cinder block base and fencing ("Blasingame wall"). It extended to an existing fence on the Jarecki property.

The Zitters experienced flooding during the winter of 2008-2009. In February 2009, an attorney for the Zitters, Cynthia Morgan, wrote to the Jareckis, noting the "[r]ecent heavy rainfalls" and stating "conditions created on your property have resulted in unacceptable surface water drainage" and it is "a landowner's duty to leave [the] natural flow of surface water undisturbed." Edward Zitter later placed sandbags at the property line to stop water flow. In a December 2009 letter, John Jarecki asked for the sandbags to be removed.

In January 2010, Edward Zitter sent the Jareckis a letter, stating he would "be erecting a new fence on [his] property south and west of [the Jarecki] garage." John Jarecki responded, in part, that the "construction . . . should not be intended to block the established flow of water . . . ." The Zitters' contractors built the wall in January or February 2010. It consisted of vinyl fencing atop cinder blocks, with a concrete footing. Edward also had the north end of the Blasingame wall cut off, which left a six-inch gap to the east. The sandbags were removed, as were cypress tress on the Zitters' property.

Subsequently, the Jareckis experienced some ponding near their garage after rain, and moss grew on the concrete.

B. *Litigation*

In January 2013, the Jareckis sued the Zitters for nuisance. In December 2013, the Jareckis made a section 998 offer to the Zitters, which they did not accept. Between 2014 and 2016, the Jareckis hired surveyors, including Coffey Engineering. John Jarecki provided interrogatory responses in July 2014, which "reflect[ed] [his] belief that the footings were on [his] property . . . ." A 2016 survey recorded by Coffey Engineering showed the property line. During this period, according to the Jareckis, the southeast property marker was found to be missing, and then replaced but moved.

In July 2016, the Jareckis filed their operative first amended complaint for nuisance and trespass. They alleged the maintenance of the wall "without . . . proper drainage and . . . obstructing the natural flow of surface water" constituted a nuisance, as their property use and enjoyment "has continuously been threatened with flooding and ponding . . . ." They also alleged the Zitters "purposely disregarded" the property line to build the wall. For trespass, the Jareckis cited the "placement of the encroaching wall and/or its footing," and the Zitters' alleged movement of the southeast property marker. They sought an injunction to "compel [the Zitters] to remove the construction," and damages.

C. *Jury Trial and Testimony*

The matter proceeded to a jury trial in November 2017. In opening statements, the Jareckis' counsel asserted Edward Zitter "understood the harm that he was going to cause by blocking th[e] water." The jury heard testimony from Edward, the Jareckis, and the parties' witnesses.

Edward Zitter testified he built the wall because "[a]fter [he] got the letter demanding [he] remove the sandbags," it "was obvious that [he] was going to have an ongoing problem" and he "had to do something." He spent

5

around $6,500. He said he became aware of the encroachment after the lawsuit was filed, and was "very surprised."

After Edward Zitter testified he created the six-inch gap, his counsel asked if he "consider[ed] where the water from the Jarecki property was going to go . . . ." He said "yes," stating, "I knew . . . if there was any water it would flow east away from the garage, and it would exit to what's now the Mellott property." His counsel then asked if he "anticipate[d] there would be ponding on the southeast corner of [the Jarecki] property"; Edward indicated he did not understand the question; and his counsel said, "I'll rephrase it. So when you were building the wall, did you have any concern that there was going to be ponding . . . . ?" Edward said, "No, because -- no, I didn't."[3] He also testified he told Mr. Mellott water "might enter his property."

Portions of Edward Zitter's 2015 video deposition also were played. When asked to confirm he "didn't leave any drainage ports," he responded, "Not through the wall. The drainage port is on the east side." He said he was "being flooded after [the Jareckis' concrete] slab was installed," the wall's "purpose was to keep [his property] from flooding," and if he left ports, it "would continue to flood." He acknowledged he saw pools of water near the Jareckis' garage after the wall was built; agreed the wall "blocks the flow of water," and he did this "over [John Jarecki's] objection." He acknowledged a drainage plan was given to him when he was dealing with attorney Morgan, but it required digging a trench, removing vegetation, and work by hand (due to space issues), which "seemed a little bit exorbitant," and they "didn't really even discuss it."

---

[3]   It is unclear if his counsel meant to say "southwest" here, which would be consistent with his closing argument (described *post*).

John Jarecki testified the maximum depth of the ponding was about an inch-and-a-quarter, lasted as long as two days, and did not reach the garage. He agreed water in the southeast corner went into the Mellot property. As for the moss, he said it was slippery when wet, and had "been going towards [his] garage . . . ." He acknowledged vinegar and other agents could remove it, but he left it due to the lawsuit. He further testified he was concerned Maria Jarecki would be "left with a problem"; the situation took time and "destroyed [his] sleep"; and they lacked "money to travel" because of it.

Maria Jarecki similarly testified the situation bothered her because "if it doesn't have a solution now, [she] won't be able to deal with it," and the "lawsuit is getting a lot of [their] money." She was also concerned about slipping. Maria was from Colombia, and described a conversation she overheard between Edward Zitter and Mr. Mellot: "I heard that they say 'How come a foreigner owns the best house on the block?' And one of them made a comment that it is okay if I heard them because I didn't speak English." Edward denied saying this, or remembering Mr. Mellot saying it.

The Jareckis' civil engineering expert, John Coffey, testified the water on their property was now "flowing from west to east" in one area, but he did not see evidence the Jareckis "had altered any of the historical drainage . . . ." He also testified there was an increase in runoff after the Jarecki property improvements, and this was due at least in part to the concrete. He said the Zitters could have addressed the water by using a brow ditch and pipe for $3,000 (for a total cost of $10,000, with "all th[e] drainage work"). Coffey agreed water that "enter[s] the southeast corner of the Jarecki property has an evacuation through the notch" in the Blasingame wall.

The Zitters' expert on civil engineering, Thomas Newsom, opined the Jareckis' improvements resulted in a "larger area flowing down to the

southeast corner," and "increas[ed] the flow" off that corner. He stated that since the wall was built, water to the southeast "flows out" through the opening. He further stated that although there was "some puddling . . . during rain at the southwest corner," it was likely "not more than about 135 square feet" and he was not "aware of any physical property damage" from it.

The parties also had experts on damages from diminution in property value. For the Jareckis, real estate agent Kay Lemenager testified the damages were $25,000, based on disclosures the Jareckis would have to make to potential buyers about the drainage, encroachment, and other issues. The Zitters' expert, appraiser Randy Tagg, opined the damages would be $2,500, based on the size of the ponding area and encroachment.

The Zitters moved for nonsuit as to Judith Zitter, which the trial court granted as to trespass. They also moved for nonsuit on punitive damages, which the court granted for Judith and denied for Edward. The court stated, "I think if you accept all of the testimony of [the Jareckis] and the circumstantial evidence on the moving of the boundary, I'm going to deny."

D.    *Jury Instructions, Closing Arguments, and Verdict*

The trial court instructed the jury that if they found harm, they must decide if Edward Zitter's conduct justified punitive damages, meaning the Jareckis "proved, by clear and convincing evidence, that [he] engaged in that conduct with malice, oppression, or fraud." The court gave the definitions for malice and oppression, which, as discussed below, require "despicable conduct" absent an intent to injure.

During closing arguments, the Jareckis' counsel argued Edward Zitter "knew how to eliminate water," had "options," and "had opportunities to consult with engineers," but "chose not to." On punitive damages specifically, he argued in pertinent part:

8

"Malice, stopping water to avoid flooding to the detriment of his neighbors. . . . [¶] . . . [¶] The oppression. [He] didn't care one way or the other what damage. I played that video for you. . . . He said, 'All I knew was that I was being flooded.' [¶] That's all he cared about, that he was being flooded. He didn't care about the other people."

The Zitters' counsel acknowledged Edward did not consult an engineer at the time, but argued he did look at "all his options," and decided the wall "would be the most cost effective and viable method." He also argued Edward "considered how [the wall] would have affected the Jarecki property"; knew he had to "provide a way for the water in the southeast corner to escape," and removed "that little bit of wall . . . to create [a] gap" to "allow the water to go off onto the Mellott property." He said that "[a]s far as any ponding in the southwest corner," Edward "didn't really consider that there would be any . . . ."

The special verdict form described the claims as "Trespass-Wall"; "Trespass-Southeast Property Marker"; and "Private Nuisance." The jury rejected the trespass claims, but found the Zitters liable for nuisance. Among other things, it found the Zitters, by "erecting the wall," created a condition that interfered with the Jareckis' property use and was harmful to health, and although the Jareckis "alter[ed] the drainage of water from their property onto the [Zitters'] property," the Zitters' "conduct, and measures taken, in building the wall" was not "reasonable in light of all of the circumstances." The jury found Edward Zitter engaged in the conduct with malice and oppression.

The jury awarded $25,000 in economic damages, based on diminution in property value, and $4,355 in non-economic damages. After further argument by counsel, the jury awarded $100,000 in punitive damages.

E.    *Post-Trial Proceedings*

In May 2019, the trial court held a bench trial on equitable relief, and determined drilling holes in the wall would abate the nuisance. The Jareckis subsequently elected a damages remedy. The Zitters completed the hole drilling by March 2020. Later that month, the trial court entered judgment.

In June 2020, the Zitters moved for a new trial, including on punitive damages. They argued there was insufficient evidence of malice and oppression, and the award was excessive. The court granted the motion in part. It found Edward Zitter's "testimony . . . and his actions without regard to the consequences to his neighbor constitute substantial evidence from which the jury could find that it is highly probable that [he] acted with malice and oppression." However, the court found the $100,000 amount was excessive, determined $32,000 was appropriate, and granted a new trial on nuisance and punitive damages unless the Jareckis accepted the remittitur. They did so.

The trial court also granted the Zitters' JNOV motion to strike diminution damages. It later granted their motion to tax costs in part, including because the section 998 offer was invalid.

In October 2020, the parties filed notices of appeal, including from the judgment and the order taxing costs. The trial court entered an amended judgment a few days later. It provided the Jareckis would recover $4,355 in non-economic damages and $32,000 in punitive damages, and ordered the Zitters to "abate the nuisance by coring holes" in the wall. The Jareckis

10

moved for costs of proof, which the court denied in December 2020. Further notices of appeal followed.[4]

DISCUSSION

I.

*Timeliness of Zitters' Post-Trial Motions And Appeal*

The Jareckis contend the Zitters' JNOV and new trial motions were untimely and invalid, the trial court lacked jurisdiction to rule on them, and the Zitters' appeal was thus untimely too.[5] We disagree.

A. *Additional Facts*

The trial court entered the initial judgment on March 13, 2020. Due to the COVID-19 pandemic, the San Diego County Superior Court deemed the period from March 17 through May 22, 2020, a court holiday, and May 25, 2020, was Memorial Day.[6] The court reopened on May 26, 2020.

Meanwhile, on April 1, 2020, the Zitters served the Jareckis with notices of intention to move for partial JNOV and for new trial or remittitur. Each notice stated in part, "Pursuant to California Code of Civil Procedure sections 12a and 660, the court's jurisdiction to rule on the motion will expire on May 27, 2020, which is 75 days after notice of entry of the judgment."

---

[4] Judith Zitter passed away during this appeal, and we granted Edward's request to substitute himself as her representative.

[5] The Zitters moved to augment the notices of intention for their motions. The Jareckis opposed, and moved to dismiss on the grounds described here. We granted the augment request, and deferred the dismissal issue (which was also addressed in the parties' briefs).

[6] See *People v. Financial Casualty & Surety, Inc.* (2021) 73 Cal.App.5th 33, 37–38 [describing COVID-19 closures].)

On May 26, 2020, the Jareckis served the Zitters with notice of entry of judgment. According to the Zitters' counsel, they tried to file their April 1, 2020 notices of intention the same day. The notices were file-stamped on May 28, 2020. On June 5, 2020, the Zitters filed their memoranda of points and authorities and supporting documents for their motions.

The trial court ruled on the motions on August 7, 2020, and the Jareckis served their acceptance of the remittitur on Friday, September 4, 2020. The 30th day after September 4, 2020, was Sunday, October 4, 2020. The Zitters filed their notice of appeal on Monday, October 5, 2020.

B.     *Governing Law*

Motions for new trial are subject to statutory time limits, which are incorporated by reference for JNOV motions. (§§ 659, subd. (a), 659a, 660 [new trial motions]; § 629, subd. (b) [JNOV motions]; see *Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 336 ["Both the 'right to move for a new trial' and the court's jurisdiction to hear it are creatures of statute."].)

A party must file and serve a "notice of . . . intention to move for a new trial, . . . either: [¶] (1) After the decision is rendered and before the entry of judgment [or] [¶] (2) Within 15 days of the date of mailing notice of entry of judgment by the clerk of the court pursuant to Section 664.5, or service upon him or her by any party of written notice of entry of judgment, or within 180 days after the entry of judgment, whichever is earliest . . . ." (§ 659, subd. (a).) Within "10 days of filing the notice," the moving party "shall serve . . . and file any brief and accompanying documents . . . ." (§ 659a.) The superior court's power to rule on the motion "expire[s] 75 days after the mailing of notice of entry of judgment by the clerk . . . or 75 days after service on the moving party by any party of written notice of entry of judgment, whichever

12

is earlier, or if that notice has not been given, 75 days after the filing of the first notice of intention to move for a new trial." (§ 660, subd. (c).)

Notices of appeal are subject to deadlines under the California Rules of Court. Generally, a party must file a notice of appeal within 60 days of the service of the notice of entry of judgment. (Rule 8.104(a)(1)(A).) However, the filing of valid post-trial motions can extend this deadline. (Rule 8.108(b)-(f).) Relevant here, if "any party serves and files a valid notice of intention to move for a new trial"; the "trial court makes a finding of excessive . . . damages and grants the motion . . . subject to the condition that the motion is denied if a party consents to . . . remittitur of damages"; and a party timely accepts the remittitur, the "time to appeal from the judgment is extended for all parties until 30 days after the date the party serves the acceptance." (Rule 8.108(b)(2)(A).)

C. *Analysis*

First, the motions were timely. The Jareckis served notice of entry of judgment on the moving party—the Zitters—on May 26, 2020. The Zitters' notices of intention, already served, were filed within the required 15 days, on May 28, 2020. (§ 659, subd. (a).) The Zitters then filed their briefs and supporting documents within the required 10 days, on June 5, 2020. (§ 659a.)

The Jareckis maintain that based on the Zitters' April 1, 2020, notices of intention, there "could be no confusion that . . . judgment had been entered," so the Zitters had to file the notices by April 16, 2020, or at least when courts reopened on May 26, 2020, and failed to do so. But the Zitters' own notices could not constitute notice of entry of judgment under the applicable statutes, because they require service *on the Zitters as moving parties*—not *by* them. (See *Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1277 (*Palmer*) ["under the express terms of sections 629, 659, and 660,

13

the time limits for bringing and ruling on motions for a new trial and for [JNOV] start to run either on the date of the court clerk's mailing or on the date of service *on the moving party* of notice of entry of judgment," italics added]; *Maroney v. Iacobsohn* (2015) 237 Cal.App.4th 473, 481 (*Maroney*) [§§ 659 and 660 "require service *on the moving party*, and Plaintiff--the moving party here--did not (and could not) serve notice of entry of judgment on herself"].) The cases cited by the Jareckis, which focus on the "form of notice," do not establish otherwise.

Second, the trial court had jurisdiction to rule on August 7, 2020. The Jareckis served notice of entry of judgment on May 26, 2020, meaning the 75-day period did not expire until August 9, 2020. (§ 660, subd. (c).) The Jareckis again try to rely on the April 1, 2020 notices of intention, arguing the Zitters "gave notice that a judgment had been entered" and the time to rule expired 75 days later on June 15, 2020, citing section 660. But section 660 likewise requires service *on the moving party*. (§ 660, subd (c); *Palmer*, *supra*, 30 Cal.4th at p. 1277; *Maroney*, *supra*, 237 Cal.App.4th at p. 481; cf. Wegner, et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2018) ¶ 18:357.3 ["[§] 660(c) requires 'service' of written notice of entry of judgment 'on' the 'moving party.' " (italics added)].)

Third, and in turn, the Zitters timely filed their notice of appeal on October 5, 2020, following the remittitur acceptance on September 4, 2020. (Rule 8.108(b)(2)(A) [notice of appeal extended until 30 days after service of acceptance]; Code Civ. Proc., § 12a, subd. (a) [due date on court holiday extends to next non-holiday date]; § 10 [Sunday is court holiday].) Based on the Jareckis' premise that the motions were untimely and rulings void, they argue their remittitur acceptance was void too (as was the amended

14

judgment) and the deadline to appeal was 60 days after their notice of entry, or July 27, 2020. We rejected that premise above.

Finally, the Jareckis contend the Zitters waived notice of entry by serving their notices of intention, citing *Henderson v. Drake* (1953) 42 Cal.2d 1 and other cases. But, as *Henderson* explains, "waiver is the *intentional* relinquishment of a known right." (*Henderson*, at p. 5; *id.* at pp. 5–6 [plaintiff "evidenc[ing] . . . actual knowledge" did not show "inten[t] to waive his right to receive written notice" for "purpose of starting . . . five-day period" to "save his attachment"]; *L.A. Times v. Alameda Corridor Transp. Auth.* (2001) 88 Cal.App.4th 1381, 1389, fn. 7 [fee motion; "[a]ctual knowledge of the entry of judgment is not enough to waive the right to receive written notice"].) The Jareckis do not establish such relinquishment, and their other cases are inapposite. (See, e.g., *Prothero v. Superior Court of County of Orange* (1925) 196 Cal. 439, 444 [case preceding current statutory scheme; written notice for new trial motion was waived by party's prior filing of notice of motion to vacate]; *Thorne v. Finn* (1886) 69 Cal. 251, 254 [service and filing of notice of intention constituted waiver, where party "took all other steps" to bring motion.)[7] We now proceed to the parties' arguments on appeal.

## II.

### *The Zitters' Appeal From Punitive Damages Award*

The Zitters argue there is no substantial evidence to support punitive damages, and the amount is excessive. We agree the record does not support punitive damages, and thus do not reach any issue regarding the amount awarded (including the Jareckis' cross-appeal from the reduction).

---

[7] Because we conclude the Zitters' motions were timely, we need not and do not consider the parties' stipulation on posttrial briefing.

15

A.    *Governing Law*

    1.    *Nuisance and Punitive Damages*

The jury awarded punitive damages based on the nuisance claim.  To establish a private nuisance, a plaintiff must "prove an interference with his use and enjoyment of his property," which is both "substantial" and "unreasonable . . . ."  (*Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 262 (*Mendez*).)

Under Civil Code section 3294, subdivision (a), punitive damages may be awarded "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  The jury here found malice and oppression.  " 'Malice' means conduct which is intended . . . to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)  " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  (Civ. Code, § 3294, subd. (c)(2).)

"Despicable conduct" is an "additional component" that "must be found," absent an intent to injure.  (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725 (*College Hospital*).)  " '[D]espicable' is a powerful term that refers to circumstances that are 'base,' 'vile,' or 'contemptible.' " (*Ibid.*; see *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287 (*Tomaselli*) [" 'Despicable conduct' is . . . 'conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.'  Such conduct has been described as '[having] the character of outrage frequently associated with crime' "].)  " '[M]ere carelessness or ignorance' " are insufficient.  (*Tomaselli*,

16

at p. 1287; *id.* at p. 1288, fn. 14 [" 'some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing' "].)

2. *Standard of Review*

We review the jury's punitive damages findings for substantial evidence, bearing in mind the heightened clear and convincing evidence standard of proof. (*Morgan v. J-M Manufacturing Company, Inc.* (2021) 60 Cal.App.5th 1078, 1089–1090; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996 ["[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."].) We "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, at pp. 1011–1012.)

We also apply appellate briefing requirements. Points must be supported by reasoned argument and authority, or may be deemed forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 (*Badie*) ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].) Points raised by the parties for the first time on reply may be forfeited as well. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 (*Raceway*) ["We generally do not consider arguments raised for the first time in a reply brief."].)

17

B.    *Analysis*

There was no substantial evidence at trial of either intentional injury, or the despicable conduct necessary for punitive damages in its absence.

1.    *No Substantial Evidence of Intentional Injury*

The Jareckis did not establish by clear and convincing evidence that Edward Zitter's building of the wall was intended to injure them.  (Civ. Code, § 3294, subds. (a), (c)(1).)

There was no dispute Edward Zitter built the wall after John Jarecki asked him to remove the sandbags (his prior attempt to control flooding), or that Edward cut a six-inch gap in the Blasingame wall for drainage.  These were not actions indicative of intent to harm (or despicable conduct, as we discuss next).  Indeed, although the Jareckis' counsel claimed in his opening statement that Edward "understood the harm" he would cause, he did not say causing harm was his *purpose*.  Similarly, during closing arguments, he argued that "all" Edward "cared about . . . was being flooded"; he "didn't care . . . what damage" happened or "about the other people"; and he could have pursued other options and consulted with engineers.  At most, these were allegations of disregard or unreasonable conduct, not intentional harm.

The Jareckis maintain Edward Zitter did intend to injure them, asserting he had a "longstanding grudge" and animus against them and he took other actions that reflected intent to harm.  But "[p]unitive damages are not simply recoverable in the abstract.  They must be tied to oppression, fraud or malice *in the conduct which gave rise to liability in the case*."  (*Medo v. Superior Court* (1988) 205 Cal.App.3d 64, 68; *Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1176 [although course of conduct can be relevant, " '[a] defendant's dissimilar acts . . . may not serve as the basis for punitive damages' "].)  Their specific points lack merit too.

18

First, even if Edward Zitter disliked the Jareckis, the Jareckis do not establish that would show intent to *injure* them. Their reliance on *King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675 is misplaced. There, the jury found the defendant fired plaintiff to avoid paying a bonus and ratified defamatory statements that he engaged in unethical conduct, and it awarded punitive damages. (*Id.* at p. 682–683.) The Court of Appeal upheld a reduced award, explaining the jury could find the managing agent "knew [her] statements would unjustly tarnish [the employee's] reputation" and cause "emotional and economic hardship." (*Id.* at pp. 711–712.) The issue was not animus, but certainty about consequences: " 'We assume [she] felt no personal animus toward [plaintiff]. But 'intent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he [or she] knows are substantially certain to result from his [or her] conduct.' " (*Ibid.*) The Jareckis do not establish Edward was substantially certain they would be injured.

Second, the Jareckis suggest other facts reflect nefarious intent. For instance, citing a photograph of an overloaded drain, they contend Edward Zitter used larger pipes elsewhere and the "reasonable inference" is that he "place[d] an undersized . . . pipe" to "create a justification for claiming to be flooded." No reasonable factfinder could find he would *induce* flooding as a pretext to spend thousands of dollars on a wall to *limit* flooding, just to harm them. Speculation is not substantial evidence. (Cf. *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1537 [plaintiff offered "nothing more than rank speculation that [investigator] was biased"].) They relatedly contend that because Edward did not pursue the plan that involved uprooting vegetation, and removed the cypress trees to build the wall, this raises an inference that he "simply wanted to vex, annoy, and harm" them.

19

But he also testified that plan involved "exorbitant" expense. The Jareckis also assert Edward denied seeing the 1996 stop-work notice, citing his trial testimony, and one could infer he "was lying" and "knew . . . diverting the water was illegal." Edward recalled the cover letter and inspector visit, just not the notice; it simply indicated he needed permits; and it was sent years earlier about a *different* wall.

2.      *No Substantial Evidence of Despicable Conduct*

There was no clear and convincing evidence that Edward Zitter engaged in despicable conduct, either. (Civ. Code, § 3294, subds. (a), (c)(1), (c)(2).)

Civil engineering experts Coffey and Newsom agreed water flow to the Zitter property increased after the Jareckis' improvements (albeit to different extents). Following heavy rains, Edward Zitter tried sandbags to limit water flow, planned to build the wall after John Jarecki asked for their removal, and told John he was doing so. He cut the six-inch gap in the Blasingame wall, which both experts acknowledged was an outlet for water in the southeast corner. And he testified he "consider[ed] where the water from the Jarecki property was going to go," told Mr. Mellot about it, and was not concerned there would be ponding on the Jarecki property. Even if the jury disregarded Newsom and Edward's testimony (as the Jareckis suggest they had a basis to do), the key facts are undisputed: Edward was responding to a water flow issue; accepted John's rejection of the sandbags and alerted him to his wall plan; and included a gap for Jarecki drainage, even if it turned out to be inadequate. This was not "vile, base, contemptible, miserable, wretched or loathsome" conduct. (*Tomaselli*, *supra*, 25 Cal.App.4th at p. 1287.)

*Lackner v. North* (2006) 135 Cal.App.4th 1188 (*Lackner*) is instructive. A snowboarder crashed into a skier who was standing still, despite trying to

avoid her.  (*Id.* at pp. 1193, 1213.)  The skier sued, including for punitive damages, and the snowboarder obtained summary judgment.  (*Ibid*.)  The Court of Appeal held the evidence was insufficient as a matter of law for punitive damages, and affirmed that part of the judgment.  (*Id.* at p. 1213.)  It noted punitive damages had been reversed when the conduct was "merely in bad faith and overzealous" or "the defendant took action to . . . minimize the injury."  (*Id.* at p. 1212.)  The court explained the snowboarder "may have acted with conscious disregard," but "in light of the conditions on the hill, his overexuberance, and his effort to avoid the collision, his conduct cannot be considered despicable . . . ."  (*Id.* at p. 1213.)

Similar to the snowboarder, Edward Zitter's conduct reflected, at most, overexuberance in addressing the water flow issue—and, potentially, insufficient regard for the ponding risk, which also is not enough for despicable conduct.  Further, like the snowboarder, Edward tried to *avoid* harm to the Jareckis, by creating the six-inch gap in the Blasingame wall.  That kind of avoidance attempt was "entirely inconsistent with evil or criminal intent."  (*Lackner, supra*, 135 Cal.App.4th at p. 1213.)

Other courts have held overzealous or unreasonable conduct does not support punitive damages, and mitigation efforts are inconsistent with them.  (See, e.g., *Tomaselli, supra*, 25 Cal.App.4th at p. 1288 [reversing punitive damages in bad faith insurance case; actions may have been "negligent," "overzealous," and "callous," but there was "nothing . . . which could be described as evil, criminal, recklessly indifferent . . . , or with a vexatious intention to injure"]; *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 335 [affirming grant of JNOV striking punitive damages; jury could conclude defendant's approach to cancer risk was "unreasonable and negligent," but it was "not clear and convincing evidence of 'despicable

21

conduct' "]; *Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123, 165 [reversing punitive damages award for homeowner, in connection with company's efforts to address stray voltage; even if "managing agents ratified . . . something, the conduct they ratified was far from despicable," noting they "were made aware of [stray voltage] in the context of [the company] attempting to mitigate it"].)

The Jareckis do not squarely address despicable conduct, other than in describing the statute. Instead, they contend Edward Zitter's actions were reprehensible and cruel, focusing on his failure to deal with drainage differently and litigation conduct, and cite old cases where punitive damages were awarded. These contentions are not persuasive.

On drainage, the Jareckis argue Edward Zitter could have addressed the drainage in the years before he built the wall, including by using a purportedly cheaper brow ditch option; could have, but did not, consult engineers; and "knew that diversion of surface waters was wrong," citing attorney Morgan's 2009 letter (which referenced this principle).

These issues essentially go to the reasonableness of Edward Zitter's conduct, which is a nuisance liability issue and not before us in this appeal. (*Mendez*, *supra*, 3 Cal.App.5th at p. 262.) That Edward did not utilize other drainage options or consult engineers sooner may not have been reasonable, but it was not despicable. The Jareckis' factual assertions lack force too. Edward testified the first time he saw the brow ditch concept was in court, and although Coffey said it would cost $3,000, his estimate for all of the drainage work was $10,000. The wall was $6,500. As for Morgan's letter, the special verdict form had the jury address Edward's reasonableness if they first found the *Jareckis* "alter[ed] the drainage"—which they did. Mere alteration of water flow, without more, is not despicable conduct.

With respect to the litigation, the Jareckis argue Edward Zitter admitted he saw pooling; was "able to abate the nuisance at any time . . . prior to the jury trial, but chose not to"; and caused them to "spend money, and imposed stress on them which affected their lives" for eight years.  But Edward could reasonably have believed the pooling or ponding did not rise to the level of a nuisance (see costs of proof discussion *post*), and litigation conduct does not support punitive damages, regardless.  (See *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 935, fn. 17 (*Holdgrafer*) [" '[P]unitive damages in a tort action cannot be based on evidence of defendants' litigation conduct occurring subsequent to the underlying tort . . . .' "].)

Finally, the Jareckis contend "punitive damages have been awarded in similar cases for nuisance."  However, they focus on cases predating the 1987 statutory amendments that "increas[ed] the plaintiff's burden of proving punitive damages at trial to 'clear and convincing evidence' " and added the " 'despicable' " conduct requirement.  (*College Hospital*, *supra*, 8 Cal.4th at p. 713, citing Stats. 1987, ch. 1498, §§ 1–7.)  "The statute's reference to 'despicable conduct' represent[ed] 'a new substantive limitation on punitive damage awards.' " (*Lackner*, *supra*, 135 Cal.App.4th at p. 1211, citing *College Hospital*, at p. 725.)

The cases are also factually distinguishable, and some involve genuinely brazen conduct.  (See, e.g., *Griffin v. Northridge* (1944) 67 Cal.App.2d 69, 71–74 [defendants trampled plaintiffs' plants, used tin can tops to cause "constant clanging," threw paint on their house, planted trees whose roots endangered their home's foundation, dissuaded a potential buyer, and more]; *McIvor v. Mercer-Fraser Co.* (1946) 76 Cal.App.2d 247, 250–254 [defendants continued excavation that caused dangerous conditions,

23

ignoring notice from city attorney and neighbors' protest]; *Sturges v. Charles L. Harney, Inc.* (1958) 165 Cal.App.2d 306, 322–323 [developer continued upslope project that led to flooding, mud, and debris, despite requests by building department and downslope residents, and said he "would not comply" with building code]; *Goshgarian v. George* (1984) 161 Cal.App.3d 1214, 1224–1225 [multiple actions by cross-defendant, including draining pool onto neighbors' property after being told to stop by sheriff's deputy and neighbors; building wall after encroachment warning; and "destroying a survey monument while declaring that such indices of property rights meant nothing to him"].)[8]

Further, even before the statutory amendments, mitigation efforts like the drainage gap could be seen as inconsistent with punitive damages. (See, e.g., *Farmy v. College Housing, Inc.* (1975) 48 Cal.App.3d 166, 173, 179–181 [reversing punitive damages in nuisance action against student housing complex, which alleged excess noise, students throwing items, and other issues, where, inter alia, owner took "acts to control" nuisance causes].)

We conclude there is no substantial evidence for punitive damages, and we will modify the judgment to strike them.

---

[8]     The Jareckis do cite post-1987 cases in discussing the punitive damages amount, and they are distinguishable too. (See, e.g., *Armitage v. Decker* (1990) 218 Cal.App.3d 887, 898, 906–907 [jury was properly instructed on punitive damages for trespass; defendant built berm that left dirt on plaintiff's property and waterway, and "took no steps" to limit runoff; failed to remove dirt after preliminary injunction; and bulldozer operation damaged plaintiff's henhouse and upset his child]; *Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 999 [affirming punitive damages against landlord who lied to regulators].)

III.

*The Jareckis' Appeal From Post-Trial Orders*

The Jareckis argue the trial court erred by granting the Zitters' JNOV on diminution damages, concluding their section 998 offer was invalid, and denying costs of proof. They establish no error.

A.     *JNOV on Diminution Damages*

The Jareckis argue the trial court's granting of the Zitters' JNOV on diminution damages improperly deprived them of their chosen remedy. We disagree. The undisputed evidence reflected the nuisance was abatable and thus continuing, which precluded diminution damages. The Jareckis do not establish procedural error, regardless.

1.     *Additional Facts*

In the Jareckis' operative complaint, they alleged in part that due to the Zitters' wall, ponding "continuously . . . threatened" their property use and enjoyment. In a proposed stipulated judgment attached to their section 998 offer, one finding stated the wall "comprises a continuing nuisance resulting from the prevention of discharge of . . . waters . . . and the encroaching footings . . . ."

At the outset of trial, the trial court asked the Jareckis' counsel what happens to damages if the court said the wall would come down. He said "damages for the sale of the property go away, because the problem is mitigated," and agreed that "gets rid of . . . diminution damages." The court stated, "So we would have the jury trial. . . . [A]nd then I would rule on the injunctive relief, which would either be . . . tear the wall down, leave the wall up, or maybe require some modification . . . ." The Jareckis' counsel said, "Holes in the wall," and the court said, "Drainage or something. Some other way of relieving the flooding."

25

Both John Jarecki and the Zitters' civil engineering expert, Newsom, testified the ponding was limited in scope and duration. When asked if he had a repair recommendation for the ponding, Newsom described a plan involving an area drain and pipe, and estimated the cost would be $7,000 to $8,000. For the encroachment, he said his recommendation would be to excavate the soil, chip that portion of the concrete, and remove it, for a cost of around $3,500. Coffey, the Jareckis' expert, was asked if "cor[ing] through the wall base . . . could alleviate the puddling condition when it rains," and said, "yeah, the water would . . . have a place to go."

In the "Trespass-Wall" section of the special verdict form, the jury found Edward Zitter did not "intentionally. . . cause an encroachment upon, or otherwise . . . enter" the Jarecki property. The nuisance questions on the form did not address the encroachment.

During argument on the amount of punitive damages, the Jareckis' counsel noted Edward Zitter "could have . . . alleviated the problems, have his walls have holes . . . ." In a subsequent discussion between the trial court and counsel, he asked the court to "order the wall removed," explaining "[i]t's the continuing nuisance that will continue to harm" the property. The court stated, "The nuisance is not the wall. The nuisance is the backing up of the water," and the Jareckis' counsel said, "Correct." The court further stated it seems "there's an election of remedies," and "diminution of value" is "inconsistent with injunctive relief." The Jareckis' counsel said he did not "believe so," but he had to do more research.

The court held a bench trial on equitable relief in May 2019. The Jareckis' counsel indicated their position was that the "wall can be there," but they wanted "penetrations" for water flow; the encroaching footing removed; and to keep damages. Expert Newsom proposed a plan that involved

"cor[ing] through the . . . wall at 5 locations," for a little over $2,900.  He had also prepared a plan involving wall removal, which was now "moot."  The court ruled:

> "The issue of damages has been resolved by the jury.  The only issue before the court is the equitable remedy . . . to stop the . . . blocking of the water on the Jarecki property.  And to do that in a reasonable fashion.  And the undisputed testimony of the engineer, Mr. Newsom, is that by drilling holes, that will allow the water to drain off the Jarecki property, and thus solve the problem. . . .  [¶] . . . [¶]  So I find that the proposal by the defendants is an appropriate way to abate the nuisance."

At a later hearing on the form of the judgment, the Jareckis elected a damages remedy, rather than equitable relief.

In June 2020, the Zitters moved for JNOV, arguing "diminution-in-value damages are not available for an abatable nuisance," and it was undisputed the nuisance was abatable.  The Jareckis opposed, arguing it was their choice to treat the nuisance as permanent or continuing, and to elect a damages remedy.

The trial court granted the JNOV.  At the hearing, the court observed, "[E]ncroachment . . . was the trespass claim, and . . . the jury just said no intentional.  But plaintiff[s] divided the case up . . . .  The only nuisance was the ponding.  And, therefore, the fact that it happens to be a wall, which may or may not be a permanent structure, I don't think is the relevant inquiry."  In its order, the court found the Jareckis "agreed to . . . the court trial on the remedy of injunction," and were bound by its decision.  It explained they "wanted to determine . . . the injunction which might be granted," so they "postponed their election," and this was an estoppel or waiver of "any challenge to the court's authority to decide the equitable issue."  The court further stated, "In light of the court's decision and the finding that the

27

nuisance was abatable, the nuisance is continuing" and "diminution damages are not available," citing *Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 592 (*Starrh*).)

The amended judgment omitted diminution damages, and ordered: "Defendants are to abate the nuisance by coring holes into the subject wall. . . . [¶] Defendants are prohibited and permanently enjoined from interfering with the flow of water through the holes cored into the subject wall . . . ."

2.     *Governing Law*

Nuisance remedies turn on whether the nuisance is permanent or continuing. "In general, a permanent nuisance is considered to be a permanent injury to property for which damages are assessed once and for all, while a continuing nuisance is considered to be a series of successive injuries for which the plaintiff must bring successive actions." (*Beck Dev. Co. v. So. Pac. Transp. Co.* (1996) 44 Cal.App.4th 1160, 1216 (*Beck*).) "In an action on a permanent nuisance, the plaintiff will be permitted to recover both past and prospective damages while in an action on a continuing nuisance prospective damages are unavailable and recovery is limited to actual injury suffered prior to commencement of each action." (*Ibid*.) The distinction is also relevant to timeliness. (*Id*. at p. 1217 [for permanent nuisance, limitations period "begins to run on the creation of the nuisance . . . , while each repetition of a continuing nuisance is considered a separate wrong which commences a new period"].)

"[D]amages for diminution in value may only be recovered for permanent, not continuing, nuisances." (*Gehr v. Baker Hughes Oil Field*

28

*Ops., Inc.* (2008) 165 Cal.App.4th 660, 663 (*Gehr*), citing *Santa Fe P'ship v. ARCO Prods. Co.* (1996) 46 Cal.App.4th 967, 977–978 (*Santa Fe*).)

Whether a nuisance is permanent or continuing "is generally a question of fact." (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 980; *Starrh, supra,* 153 Cal.App.4th at p. 597 ["trial court may remove the issue of fact from the jury by directed verdict only if there is no evidence tending to prove" the contrary].) The " 'crucial test of the permanency of a trespass or nuisance is whether the trespass or nuisance can be discontinued or abated.' " (*Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087, 1097 (*Mangini*); *id.* at p. 1103 [" 'abatable' means that the nuisance can be remedied at a reasonable cost by reasonable means"]; *Starrh, supra,* 153 Cal.App.4th at p. 594 [courts also may consider if the activity is " 'currently continuing' " and if " 'the impact of the condition will vary over time' "].)

We generally review an order granting JNOV to determine "whether any substantial evidence . . . supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) "However, to the extent [the motion] raises legal issues such as the application of law to undisputed facts . . . , we review the trial court's ruling on the motion de novo." (*Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598.)

3.    *Analysis*

a.    *Diminution Damages Were Unavailable*

The parties disagree as to the impact of the jury findings, which did not address abatement, and their burdens in connection with them. (See *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 328–329 [directing grant of JNOV on issue for which special verdict lacked finding, and disagreeing defendant invited error; it "was plaintiffs['] responsibility to tender their case to the jury"]; *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 531 [where there is only

29

special verdict, "we will not imply findings in favor of the prevailing party"]; cf. *Mangini*, *supra*, 12 Cal.4th at p. 1103 ["Since plaintiffs failed to prove a continuing nuisance, damages awarded on that theory may not stand."].)

We need not resolve those issues, because the undisputed evidence reflects the nuisance was abatable and thus continuing—meaning diminution damages were unavailable.

As tried to the jury, the Jareckis' nuisance claim was that the Zitters built a wall that caused ponding, which interfered with their property use and was harmful to health. The undisputed evidence showed the ponding was limited in scope, and could be abated "at a reasonable cost by reasonable means." (See *Mangini, supra,* 12 Cal.4th at p. 1103.) Newsom initially testified about a drainage plan that would not exceed $8,000, while Coffey agreed the hole-drilling plan provided somewhere for the water to go. Evidence at the bench trial showed the hole-drilling plan cost under $3,000.

The Jareckis identify no evidence that the nuisance was not abatable. (*Starrh*, *supra*, 153 Cal.App.4th at pp. 589, 597 [affirming judgment based on partially directed verdict; appellant cited no evidence to support "factual conclusion different from that reached by the trial court, i.e., that the trespassing was continuing"].) And they have acknowledged abatement *was* possible. They first indicated the nuisance was continuing in their complaint and section 998 offer; their counsel then noted at a pretrial hearing that holes could provide drainage (which Coffey later testified to); and, during argument on punitive damages, their counsel said Edward could have "alleviated the problem" this way. In their briefing on punitive damages here, the Jareckis assert Edward was "able to abate the nuisance" and chose not to. Addressing abatement, they state, "Obviously, the wall could be removed and the drainage paths restored," but "simply drilling the holes did not resolve the

30

other defects in the Jarecki property caused by the Zitter[s'] nuisance" and they "still have an encroachment." The issue is whether the nuisance *could* reasonably be abated, not whether it already was. (Cf. *Mangini*, *supra*, 12 Cal.4th at p. 1097.)

Accordingly, diminution damages were not available. (*Gehr*, *supra*, 165 Cal.App.4th at p. 663; *Santa Fe*, *supra*, 46 Cal.App.4th at pp. 977–978; cf. *Holdgrafer*, *supra*, 160 Cal.App.4th at p. 926 [if defendant could abate contamination, "injury was continuing," and plaintiffs "would not be entitled to recover damages for the diminished value of their property"].)

The Jareckis do not persuade us to reach a different result.

First, they appear to question whether the abatement standard applies here, contending *Mangini* is distinguishable because it was a statute of limitations case. (See *Mangini*, *supra*, 12 Cal.4th at p. 1090 [deeming nuisance permanent and agreeing action was time-barred, where plaintiff presented no evidence condition could be abated; declining to opine if timely-filed action required proof of abatement at reasonable cost].) But the permanence of a nuisance impacts *both* timeliness and damages, and abatability has been accepted as a crucial test. (*Id.* at p. 1097; see *Starrh*, *supra*, 153 Cal.App.4th at pp. 598–599 [acknowledging open question in *Mangini*, and stating, "[W]hether a trespass is continuing . . . is ultimately a damages question" and its " 'nature' . . . does not change simply to accommodate a legal theory."].) Further, the Jareckis do not explain how any other test supports a permanent nuisance here, either. (Cf. *Starrh*, at p. 594.)

Second, as noted, the Jareckis suggest the hole-drilling abatement was insufficient, because they still had an encroachment. This focus on encroachment is unavailing. For one thing, they did not try their nuisance

31

claim that way, and the verdict form addressed encroachment only for trespass. Even if encroachment were part of the Jareckis' nuisance claim, that still would not mean the nuisance was permanent.

Although the "cases finding the nuisance . . . to be unquestionably permanent in nature have involved solid structures," even "more substantial physical invasions of land have been held to be continuing in character . . . ." (*Baker v. Burbank–Glendale–Pasadena Airport Authority* (1985) 39 Cal.3d 862, 869–870; *ibid.* [distinction is a "complaint made, not of the location of the offending structures, but of the continuing use," citing *Tracy v. Ferrera* (1956) 144 Cal.App.2d 827]; *Tracy*, at p. 828 [rain water from neighbors' lack of "proper gutters or drainage," and emissions from pipes and furnaces, were continuing nuisances]; compare, e.g., *Baker*, at p. 869 [permanent nuisances include encroaching building]; *Field–Escandon v. DeMann* (1988) 204 Cal.App.3d 228, 237 [sewer pipe buried eight feet]; *Spar v. Pac. Bell* (1991) 235 Cal.App.3d 1480, 1487 (*Spar*) [telephone line buried 10 feet, "designed to have a useful life of 100 years"].)

Courts have determined both ponding impacts from structures, and encroaching walls, may be continuing nuisances. (See *Starrh, supra*, 153 Cal.App.4th at pp. 596–597 [migration of waste water from oil production storage ponds was "classic continuing trespass"; it is "not the pond's structure that constitutes a trespass," but the "water that permeates through the pond," and "ponding practice can be reduced or discontinued"]; *Madani v. Rabinowitz* (2020) 45 Cal.App.5th 602, 606–607, 609 [affirming bench trial ruling that fence was continuing trespass and nuisance, where it was replaced before and relocation cost was $5,000-$6,000; "cost of relocating a boundary fence or wall pales in comparison to the property value" and "it is difficult to conceive of a case where relocation . . . would be so costly as to

32

render it a permanent encroachment"].)  Here, the record unequivocally established there were abatement options for the ponding; for the encroachment, were it part of the nuisance claim; and even for wall removal, had the Jareckis pursued it.

###### b.    *No Procedural Error*

Because there was no evidence for a permanent nuisance and thus no basis for diminution damages, any procedural errors by the trial court were harmless.  But we elect to explain why the Jareckis do not establish any error in this regard, either.

First, the Jareckis contend the question of whether the nuisance was permanent was for the jury.  Again, the parties disagree as to who was responsible for such jury findings, and, either way, the Jareckis acquiesced in the trial court's plan to address injunctive relief after the jury trial.  They do not establish that sequence was impermissible.

In general, " 'where legal and equitable issues are joined in the same action the parties are entitled to a jury trial on the legal issues,' " and a "trial court handling such a combined action could, and in many cases should, hold a bench trial on any equitable issues first."  (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 354–355 (*Alcoa*).)  But sequencing is a matter of discretion (*id.* at p. 353), and when the jury trial is first, and the court's "determination [in equity] [is] founded on issues of fact distinct from those supporting the jury verdict," the court is "not bound by that verdict."  (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 161.)  The issue of abatement was not before the jury, and the trial court was free to address the issue during the equitable hearing.

The Jareckis' reliance on *Darbun Enterprises, Inc. v. San Fernando Community Hospital* (2015) 239 Cal.App.4th 399 is misplaced.  *Darbun*

33

involved reversal of a JNOV grant, after a trial court improperly revisited liability during the equitable trial. (*Id.* at p. 402.) The reviewing court noted a "trial court may not act as a fact finder on issues it specifically reserves for jury determination." (*Ibid.*) The issue here is abatement, and the court did not reserve it for the jury. (Cf. *Alcoa*, *supra*, 12 Cal.App.5th at pp. 358–359 [rejecting reliance on *Darbun*, where trial court "did not limit the issues it would consider" in "bench trial on the . . . equitable claims"].) *Darbun* also involved distinguishable conduct by the trial court there. (*Alcoa*, at p. 358 ["*Darbun* found error based on the trial court's 'inconsistent and misleading statements' regarding, among other things, which issues would be decided during the first-phase bench trial"].)

Second, the Jareckis argue they were "entitled to determine which remedy to elect," and the trial court should not have "disturb[ed] that election." But a plaintiff does not have an "unbridled election. . . ." (*Spar*, *supra*, 235 Cal.App.3d at p. 1487.) It is in "doubtful cases" that a plaintiff can "elect[] to treat the nuisance as either permanent or not." (*Spaulding v. Cameron* (1952) 38 Cal.2d 265, 268; *id.* at pp. 268–269 [evidence was conflicting as to whether abatement was possible, and trial court found permanent damage, yet ordered corrective measures].) And the present case was not close. Abatement was possible, as the undisputed evidence reflected and the trial court found, and the court made no finding of permanent damage. (See *Beck*, *supra*, 44 Cal.App.4th at p. 1217 ["While a plaintiff's election of remedies is entitled to deference in doubtful cases, that choice must nevertheless be supported by evidence that makes it reasonable under the circumstances."]; 6 Miller & Starr, Cal. Real Estate (4th ed. 2023) § 19:22, p. 19-103 ["[w]hen the nuisance is abatable . . . there is no right to make an election"]; cf. *Spaulding*, at p. 268 [if a "defendant is willing and able to abate

34

the nuisance, it is unfair to award damages on the theory that it will continue"].)

Third, the Jareckis argue that "[s]eeking alternative and inconsistent remedies is not subject to estoppel unless the defendant suffered a substantial injury" from the initial remedy election. They are referencing remedy election principles based on equitable estoppel, which are not the kind of nuisance remedy issues before us and their authorities thus provide no guidance. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 759 [noting "election of remedies doctrine is based on equitable estoppel," and describing general principles]; see *id.* at pp. 726–727 [construction contract]; *Mansfield v. Pickwick Stages, Northern Div., Inc.* (1923) 191 Cal. 129, 130 [personal injury]; *Felix v. Workmen's Comp. Appeals Bd.* (1974) 41 Cal.App.3d 759, 765 [workers' compensation and personal injury].)[9]

In sum, the Jareckis do not establish the court erred in granting the Zitters' JNOV and striking diminution damages.

---

[9] Additional cases they cite on reply do not involve nuisance remedies, either. (See, e.g., *Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1214 [investor dispute].) To the extent they raise other new points about remedies on reply, we deem them forfeited. (*Raceway*, *supra*, 2 Cal.5th at p. 178.)

B.    *Section 998*

The Jareckis contend the trial court erred by ruling their section 998 offer was invalid and taxing expert costs.  This contention lacks merit.[10]

1.    *Additional Facts*

The Zitters obtained a survey in November 2013 from surveyor Casey Lynch, which, according to the Jareckis, showed the wall was over the property line.  The Zitters maintain Lynch "did not conclude that the wall's footing encroached," and they did not discover the encroachment until July 2014.

In December 2013, the Jareckis made their section 998 offer.  The offer required the Zitters to pay $15,000, and had an attachment with four additional terms.  Within 30 days of notice of entry of judgment, the Zitters had to:  (A) "immediately abate all conditions that cause or maintain the nuisance"; (B) "remove the subject wall and fence identified at Exhibit A"; and (C) "remove the encroaching footing and back-filled concrete of the subject wall and fence . . . ."  Term (D) stated: "Defendants are permanently enjoined from unreasonably interfering with the surface and flood discharge of water from the Jarecki Property."  Exhibit A was a map depicting the property lines and wall.  The stipulated judgment provided with the offer set forth a background section and findings, which characterized the Zitters as

_____

10    The Jareckis also claim the motion to tax was untimely, and " '[s]ection 4 of [their] brief' . . . explains why," but we see no such explanation.  Nor is the proof of service for their costs memorandum in their respondent's appendix.  At any rate, the Zitters provided the proof of service in a cross-respondent's appendix (showing electronic service on June 10, 2020), and their June 29, 2020, motion was timely.  (Rule 3.1700(b)(1) [motion to tax due 15 days after service, unless extended, including for electronic service under § 1010.6(a)(4)]; § 1010.6(a)(3)(B) (previously § 1010.6(a)(4)) [two court days; here from Thurs., June 25 to Mon., June 29].)

36

acting unreasonably by building the wall, as well as orders incorporating the offer terms. The Zitters did not accept the offer.

After entry of the initial judgment, the Jareckis sought nearly $42,000 in expert witness costs. The Zitters moved to tax these costs, asserting the section 998 offer was invalid.

The trial court agreed and taxed the expert costs, citing *MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036 (*MacQuiddy*). The court stated the terms " 'abate all conditions that cause or maintain the nuisance' in item A" and " 'unreasonably interfering' in item D' . . . render[ed] [the offer] ambiguous." The court then stated the "ambiguities are exemplified by the parties' on-going dispute over the language of the [amended] judgment yet to be agreed upon or entered in this case."

2. *Governing Law*

Section 998 "establishes a procedure for shifting the costs upon a party's refusal to settle." (*Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86 (*Ignacio*); *Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 268 (*Staffpro*) [purpose of § 998 is to "encourage the settlement of litigation without trial, by punishing the party who fails to accept a reasonable settlement offer from its opponent"].)

Recoverable amounts include expert witness costs. (§ 998, subds. (c)(1), (d).) If a plaintiff makes an offer to settle a lawsuit, the defendant rejects it, and "the defendant fails to obtain a more favorable judgment," a trial court has discretion to "require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses . . . ." (§ 998, subd. (d).)

"The burden is on the offering party to demonstrate that the offer is valid under section 998." (*Ignacio, supra,* 2 Cal.App.5th at p. 86.) The "offer must be sufficiently specific to permit the recipient meaningfully to evaluate

37

it and make a reasoned decision whether to accept it . . . ." (*Berg v. Darden* (2004) 120 Cal.App.4th 721, 727 (*Berg*).)

Whether a section 998 offer is "sufficiently certain to be enforceable involves a question of law, which we review de novo." (*Staffpro, supra*, 119 Cal.App.4th at p. 268.) "In interpreting a section 998 offer, general contract principles apply when they neither conflict with nor defeat the statute's purpose of encouraging the settlement of lawsuits prior to trial." (*Ibid*.) A contract is ambiguous if it "is susceptible of more than one reasonable interpretation." (*Fremont Indemnity Co v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 114.)

3.     *Analysis*

The Jareckis do not establish the trial court erred in taxing their expert costs. Their section 998 offer required the Zitters to, among other things, " 'abate all conditions that cause or maintain the nuisance' " and stated they would be enjoined from "unreasonably interfering with the surface and flood discharge of water from the Jarecki Property." Although "nonmonetary terms and conditions do[] not render a section 998 offer invalid," those " 'terms or conditions must be sufficiently certain and capable of valuation . . . .' " (*Covert v. FCA USA, LLC* (2022) 73 Cal.App.5th 821, 833, 841.) We conclude these terms were ambiguous and rendered the offer invalid.

*MacQuiddy*, cited by the trial court, offers guidance. A buyer sued a manufacturer under the Song-Beverly Act for not repairing or replacing his car, and rejected a section 998 offer that provided for repurchase in "an undamaged condition, save normal wear and tear." (*MacQuiddy, supra*, 233 Cal.App.4th at p. 1041.) The trial court eventually entered judgment for a stipulated amount "in exchange for return of the subject vehicle," and issued

a costs order based on the section 998 offer.  (*Id*. at pp. 1042–1043.)  The Court of Appeal reversed, holding that "[b]ecause of the undefined and subjective nature of the term that [the manufacturer] would repurchase the 'undamaged' car," the offer was "at least ambiguous" and "therefore not valid."  (*Id*. at p. 1050.)  In explaining how the term "inserted uncertainty," the court stated, in part:

> "Whether the car was in an 'undamaged condition' was not defined, nor was it clear what would happen if [he] accepted the offer, but [the manufacturer] subsequently concluded the car was 'damaged' beyond normal wear and tear.  While the offer allowed that the amount, charges, and costs were 'all to be determined by court motion if the parties cannot agree,' everything besides the condition of the car was at least minimally determined by the Act itself."  (*MacQuiddy*, *supra*, 233 Cal.App.4th at p. 1050.)

Here, too, the nonmonetary terms were not defined, and it was unclear what would happen if the Zitters accepted the offer.  Term A required them to "abate all conditions that cause . . . the nuisance," but it did not identify an adequate abatement or "all conditions" at issue.  The Jareckis contend they "wanted the wall down" and "specifically informed" the Zitters of the required actions to take or avoid.  But term B separately required the Zitters to "remove the . . . wall"—implying term A could require something more—and the offer did not specify what term A required.  As for term D's injunction on "unreasonably interfering with the . . . discharge of water," this was general enough to potentially apply to *any* future effort by the Zitters to manage water flow from the Jarecki property.  (Cf. *Sanford v. Rasnick* (2016) 246 Cal.App.4th 1121, 1130–1131 [offer requiring, but not attaching, settlement agreement was invalid; offer left party "to guess at what terms" might be required].)

These ambiguities made it impossible to evaluate the offer, rendering it invalid and unenforceable. (See also, e.g., *Valentino v. Elliott Sav-On Gas, Inc.* (1988) 201 Cal.App.3d 692, 694–699 (*Valentino*) [reversing § 998 costs to prevailing gas station in personal injury lawsuit; offer released gas station, its attorney, and its insurance carrier on "potential unfiled claims," which made it "impractical if not impossible to accurately and fairly evaluate the offer"]; *Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 803 [invalid § 998 offer; "valuing a confidentiality clause attached to a settlement offer in a defamation action is too subjective and, therefore, cannot be done"].)

The Jareckis contend *MacQuiddy* is distinguishable. They argue the "undamaged condition" term there "was ambiguous because, unlike the rest of the [section 998] offer," it "did not track the language of the Act." We disagree. As our discussion above reflects, the court determined the term was ambiguous because it was "undefined," "subjective," and "inserted uncertainty . . . ." (*MacQuiddy*, *supra*, 233 Cal.App.4th at p. 1050.) The Jareckis also try to distinguish *Valentino*, asserting the offer here did not involve a release. The problem in *Valentino* was not the release, per se; it was that the offer potentially encompassed issues beyond the case—just as the Jareckis' offer could do. (*Valentino*, *supra*, 201 Cal.App.3d at p. 696.)

The Jareckis' other arguments lack merit as well.

First, they argue the section 998 offer would not have been ambiguous to the Zitters, "given the long history" between the parties, the November 2013 survey purportedly showing encroachment, and the complaint and discovery. Nothing in the parties' history, or the survey, shed light on what "abatement" the Jareckis would deem sufficient, beyond wall removal; "all conditions" at issue; or what conduct they would view as an "unreasonable interference." They also identify no language in the complaint or discovery

40

defining these terms. *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, cited by the Jareckis, does not involve section 998 and does involve the kind of specificity missing here. (*Id.* at p. 534 [injunction was "neither uncertain nor overbroad"; based on record, party was "given proper notice as to what conduct has been enjoined; he must not obstruct ingress and egress from the driveway to Continental's concrete loading area"].)

Second, the Jareckis suggest the offer term "unreasonably interfering" is not ambiguous, because similar language appears in the jury instruction for private nuisance (CACI No. 2021). They state " '[u]nreasonable' is a word that is actually used," and quote the phrases "[s]ubstantially interfere" and "reasonably annoyed or disturbed . . . ." Even if the offer term appeared in the instruction (it does not), it would not mean the Zitters knew what the *Jareckis* meant by the term. (*Staffpro, supra*, 119 Cal.App.4th at p. 268 ["general contract principles" apply to § 998 offers]; cf. *Arriagarazo v. BMW of North America, LLC* (2021) 64 Cal.App.5th 742, 748 ["mutual intention of the parties . . . governs"].)

The Jareckis also argue the "unreasonably interfering" term was a "limitation on the proposed injunction," which anticipated they would tolerate the Zitters' "reasonable use of their property" and that such use in "compli[ance] with law and ordinance" was allowed. But it is just as unclear what the Jareckis would view as "reasonable." Even if they considered illegal conduct to be unreasonable, it does not follow that they would consider any *legal* conduct to be *reasonable*.

Third, the Jareckis argue the section 998 offer "was not ambiguous because it was capable of valuation," citing Lemenager's trial testimony that there was a $25,000 diminution in value due to anticipated disclosures about drainage, encroachment, and other issues. The section 998 offer is evaluated

41

not after trial, but as of "the time the offeree receives it," and Lemenager was opining on property valuation, not the scope or value of the offer. (*Duff v. Jaguar Land Rover North America, LLC* (2022) 74 Cal.App.5th 491, 500; see *Valentino*, *supra*, 201 Cal.App.3d at p. 698 [value "must be measured as of the time [the party] made its . . . offer and without the benefit of hindsight"]; *Berg*, *supra*, 120 Cal.App.4th at p. 727 [offeree must be able to "meaningfully . . . evaluate" the offer].) If anything, her testimony underscores that the Jareckis had wide-ranging concerns about the Zitters' conduct, which their acceptance of the section 998 offer would not necessarily resolve.

Finally, and notwithstanding the prior argument, the Jareckis contend on reply that the trial court improperly evaluated the section 998 offer after the time of receipt, citing its comment about the parties' dispute about judgment language. Our review of the offer's validity is de novo (*Staffpro*, *supra*, 119 Cal.App.4th at p. 268), and any error here was harmless. The court first determined the terms were ambiguous, and then noted the parties' later conduct illustrated the ambiguity. The illustration was not necessary for the court's analysis.

C.  *Costs of Proof*

Finally, the Jareckis contend the trial court erred in denying their motion for costs of proof. Section 2033.420 permits a party to recover costs when the opposing party denies requests for admission (RFAs), the propounding party proves the issue at trial, and the responding party does not establish an applicable exception. The Jareckis establish no error.

1.  *Additional Facts*

In early 2014, the Jareckis served two sets of RFAs, with a total of 66 requests. The RFAs at issue here primarily involved property entry and the location of the wall; natural water flow; whether the wall was built without

42

drainage; and pooling on the Jarecki property. The Zitters served responses and supplemental responses later that year, some with objections or other qualifications.

We recap and expand on trial proceedings pertinent to costs of proof. In the Zitters' trial brief, filed in October 2017, they stated there was "no dispute" the "wall's footing encroaches a maximum of 3 1/8 inches" on the Jarecki property. At a pretrial hearing that month, their counsel offered to stipulate to that fact. He also addressed the anticipated testimony of civil engineering expert Newsom, including regarding the limited extent of the puddling or ponding.

Newsom testified about the ponding, as well as on other water and boundary issues. The Jareckis' civil engineering expert, Coffey, likewise testified about both water flow and boundary issues. Both parties also offered additional expert testimony, from these and other experts, including about the property marker movement. During a mid-trial discussion between the trial court and counsel regarding one expert, the court noted, "The theory of the defense is that the drainage was altered. It's got nothing to do with the preexisting drainage." The jury subsequently found the Jareckis did alter the drainage.

Portions of Edward Zitter's 2015 deposition played at trial included his acknowledgements that he did not leave drainage ports in the wall itself; the wall "blocks the flow of water"; and he saw pools of water near the Jareckis' garage. John Jarecki's testimony encompassed, among other things, the limited depth and duration of the ponding and the moss growth.

After a recess during one day of witness testimony, the trial court advised the jury, "The parties have stipulated that the Coffey record survey done in 2016 is the correct and controlling survey. That's the survey that

43

sets forth the accurate property line." The court later noted the stipulation while giving the jury instructions.

The Jareckis moved for costs of proof. In support of their motion, they filed a 15-page memorandum of points and authorities (on 28-line pleading paper, but with around 31 lines of text per page) and a 48-page "separate statement" (which addressed proof at trial and why each RFA was of substantial importance). They also filed attorney declarations, one of which attached a 47-page attorney time record and expert time records. That declaration stated that "[t]o the extent possible, [the Jareckis] have segregated out . . . fees and expenses" for "matters . . . not encompassed by the RFA[s]" at issue, and "[f]urther apportionment is not practical . . . ." It also stated the "vast majority of the time and expense" was for nuisance, and "[e]stablishing . . . the trespass claim as to the construction of the wall[] relied on the same experts . . . ."

The Zitters opposed the motion, for not complying with the court rules and on the merits. They argued the Jareckis sought costs for matters that were admitted, insignificant, or which they did not prove, and their denials were reasonable. Additionally, they contended the Jareckis "made no effort to segregate the claimed costs based on the matters at issue in the RFAs."

In December 2020, the trial court issued its ruling. The court denied the motion as "procedurally improper," as it did not comply with line and space requirements; on merits grounds, for multiple reasons; and for failing to provide a "specific accounting" of costs, by not segregating costs. We describe each ruling in our analysis below.

2.      *Governing Law*

"Requests for admissions differ fundamentally from other forms of discovery." (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864 (*Stull*).) Their

44

" 'primary purpose . . . is to set at rest triable issues so that they will not have to be tried; they are aimed at expediting trial.' " (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 (*Brooks*).)

Under section 2033.420, "[w]hen a party propounds requests for admission of the truth of certain facts and the responding party denies the requests, if the propounding party proves the truth of those facts at trial, he or she may seek an award of the reasonable costs and attorney fees incurred in proving those facts." (*Grace v. Mansourian* (2015) 240 Cal.App.4th 523, 529 (*Grace*), citing § 2033.420, subd. (a).)

A trial court shall award costs unless it finds any of the following exceptions: "(1) An objection to the request was sustained or a response to it was waived . . . . [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit." (§ 2033.420, subd. (b).) The party seeking to benefit from an exception has the burden to establish it. (*Samsky v. State Farm Mutual Automobile Ins. Co.* (2019) 37 Cal.App.5th 517, 523.)

We review the court's order denying costs of proof for abuse of discretion. (*Stull, supra*, 92 Cal.App.4th at p. 864.) "An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason." (*Ibid*.) In interpreting the rules of court, we apply the "usual rules of statutory construction." (*Volkswagen of America, Inc. v. Superior Court* (2001) 94 Cal.App.4th 695, 703.)

45

3.    *Analysis*

a.    *Denial on Procedural Grounds*

The trial court determined the Jareckis' moving memorandum "fails to comply with the line numbering requirements of [Rule] 2.108(4)."  It also determined the "[s]eparate [s]tatement which includes argument is in violation of the page requirements of [Rule] 3.1113(d)," and rejected the Jareckis' reliance on the separate statement requirements for motions to compel in Rule 3.1345.

First, the trial court properly concluded the Jareckis violated the line requirements of Rule 2.108.  The rule states, in pertinent part:

> "(1)  The lines on each page must be one and one-half spaced or double-spaced and numbered consecutively. [¶] . . . [¶]

> "(4)  Line numbers must be placed at the left margin and separated from the text by a vertical column of space at least 1/5 inch wide or a single or double vertical line.  Each line number must be aligned with a line of type, or the line numbers must be evenly spaced vertically on the page. Line numbers must be consecutively numbered, beginning with the number 1 on each page.  There must be at least three line numbers for every vertical inch on the page."

The trial court determined the Jareckis' memorandum violated this rule because it "contains line numbers 1-28 in the margin, but actually contains 31 lines of text," citing subsection 4.  The Jareckis argue subsection 4 permits *either* that "[e]ach line number must be aligned with a line of type," *or* that "the line numbers must be evenly spaced vertically on the page," and their memorandum was compliant because their lines were evenly spaced.

But Subsection 4 cannot be read by itself.  (*In re Alonzo J.* (2014) 58 Cal.4th 924, 933 [" '[W]e do not examine [disputed rule] language in isolation, but in the context of the . . . framework as a whole in order to determine its

46

scope and purpose and to harmonize the various parts' "].)  Subsection 1 requires that "lines on each page must be . . . numbered consecutively"—so every line must *have* a number, whether or not it is aligned with it.  The Jareckis thus did not comply with Rule 2.108.  That the trial court did not also cite subsection 1 does not undermine its conclusion.  Further, the Jareckis' memorandum was already 15 pages, and the extra lines essentially let them improperly exceed page limits as well.  (See Rule 3.1113(d) ["no opening or responding memorandum may exceed 15 pages," except for summary judgment or adjudication]; cf. *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 28–29 [awarding attorney fees on appeal to respondent; "large chunks of text[]" in appellant's brief were "placed, single-spaced, in 50 footnotes . . . for the sole purpose of reducing the number of pages in the brief"].)

Second, the trial court also properly concluded the Jareckis could not use Rule 3.1345 to exceed the applicable page limit in Rule 3.1113(d).  Rule 3.1345, titled "Format of discovery motions," is one of the rules governing "Discovery Motions."  Subsection (a) provides:

> "[A]ny motion involving the content of a discovery request or the responses to such a request must be accompanied by a separate statement.  The motions that require a separate statement include a motion:
> (1)  To compel further responses to requests for admission;
> (2)  To compel further responses to interrogatories;
> (3)  To compel further responses to a demand for inspection of documents or tangible things;
> (4)  To compel answers at a deposition;
> (5)  To compel or to quash the production of documents or tangible things at a deposition;
> (6)  For medical examination over objection; and
> (7)  For issue or evidentiary sanctions."

Rule 3.1345, subsection (c), titled "Contents of separate statement," explains, in part, that the "separate statement is a separate document filed and served with the discovery motion that provides all the information necessary to understand each discovery request and all the responses to it that are at issue." Required contents include a "statement of the factual and legal reasons for compelling further responses, answers, or production as to each matter in dispute." (Rule 3.1345(c)(3).)

This rule does not authorize the filing of a separate statement in support of a motion for costs of proof. Rather, the rule's location, title, and text make clear it is intended to apply to *discovery* motions, which seek to compel or otherwise control discovery. The phrases "involving the content of a discovery request" and "including" do not support a reading beyond that purpose, or function as mere surplusage when so limited (as the Jareckis suggest). (Rule 3.1345(a).) Indeed, the listed examples illustrate that motions encompassed by the rule involve information, or limits on such, even if not in a motion to compel format (e.g. "[t]o quash the production of documents"].). (Rule 3.1345(a)(1)-(7).) None focus on costs. (Cf. *City of Glendale v. Marcus Cable Associates, LLC* (2015) 235 Cal.App.4th 344, 354 ["costs of proof . . . are awarded after trial; therefore, an award of such costs is not a device used by trial courts to control pretrial proceedings"].)

The Jareckis also disregard the purpose of the rule: to provide the trial court and other parties with "all the information necessary" to assess a motion to compel. (Rule 3.1345(c).) It is not to give a party seeking costs of proof extra space for their argument.

b. *Denial on Merits Grounds*

The trial court also determined the motion failed on the merits. The Jareckis do not establish the court exceeded the bounds of reason. (See *Stull*, *supra*, 92 Cal.App.4th at p. 864.)

First, for RFAs 1, 4-5, 10-13, 15-19, 22-25, and 54-57, the trial court found the admissions sought had "no substantial importance," stating "[e]ach . . . relat[es] to [the] trespass claims" and the jury "found against" the Jareckis on these claims. The court then set forth the special verdict findings that Edward did not intentionally encroach or move the marker, and said, "even assuming the [Jareckis] proved the matters at issue, the proof did not cause the jury to find in favor of [them]." RFAs 1, 4-5, and 10-13 asked about entry onto the Jarecki property. RFA 15 asked about the Zitters' awareness of the boundary in February 2010. RFAs 16-19 and 22-25 asked about wall construction on or along the Jarecki property. RFAs 54-57 asked about sandbag placement and resulting pooling.

The Jareckis assert their "requests concerned matters that were crucial to their trespass and nuisance claims," citing their separate statement; argue the trial court erred in analyzing substantial importance; and suggest the Zitters' failure to secure nonsuit on nuisance supports it. We are not persuaded.

There are two preliminary issues here. The Jareckis' reliance on their separate statement, instead of articulating why each RFA is of substantial importance, is not a sufficient argument for purposes of appellate review. (*Badie*, *supra*, 67 Cal.App.4th at pp. 784–785; see *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 690, fn. 18 [" 'An appellant cannot rely on incorporation of trial court papers, but must tender arguments in the appellate briefs.' " (italics omitted)].) Also, costs are unavailable for the RFAs

49

relating to wall location, as the Zitters stipulated to the encroachment. "Costs of proof are recoverable only where the moving party actually proves the matters," meaning "evidence must be introduced" and they "cannot be awarded if the parties stipulated" to facts. (*Grace*, *supra*, 240 Cal.App.4th at pp. 529–530.) The Jareckis claim the parties only stipulated to the Coffey survey, at trial. This ignores the Zitters' repeated, prior admissions. They conceded the encroachment in their trial brief, and offered to stipulate to the fact before trial. (Cf. *Stull*, *supra*, 92 Cal.App.4th at p. 866 ["Defendants' concession immediately prior to trial made . . . proof unnecessary."].) Then, in opening statements, their counsel explained there was an accidental encroachment—which the Jareckis characterize elsewhere in their briefing as an "admi[ssion]."

To the extent we reach the Jareckis' arguments, they lack merit. " 'An issue is of "substantial importance" if it has "at least some direct relationship to one of the central issues in the case, i.e., an issue which, if not proven, would have altered the results in the case." ' " (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 752, fn. 20, citing *Brooks*, *supra*, 179 Cal.App.3d at p. 509; *Brooks*, at p. 509, fn. 5 [nonprevailing party can recover costs, so "fact in question need not have been one which would have altered determination of the ultimate issues"].)

The Jareckis contend the trial court instead focused improperly on whether they "won a cause of action." They establish no abuse of discretion. Setting aside the RFAs about the sandbags (the relevance of which the Jareckis do not explain in their briefing), these RFAs essentially asked Edward to admit he entered and built the wall on the Jarecki lot—hence the court's reasonable finding that they related to trespass. The Jareckis' trespass claims were that Edward intentionally trespassed in constructing

50

the wall and moving the property marker. And in rejecting the wall claim, the jury found no intentional encroachment. The court could impliedly and reasonably conclude that, given the Jareckis failed to prove this dispositive fact for the wall claim and the RFAs did not relate to the marker claim, the trespass-related RFAs would not "have altered the results in the case." (*Brooks*, *supra*, 179 Cal.App.3d at p. 509; compare *id.* at pp. 511–512 [where truck driver's position was that accident with bus occurred because he had to swerve to miss it, RFA regarding whether truck was in its own lane was "dispositive of a central issue" and trial court was within discretion to find it was of substantial importance].)

As for nonsuit, the Jareckis argue the Zitters obtained nonsuit only as to Judith, and on trespass, and if they had "not proven the matters, the nonsuit may have been granted as to nuisance . . . thus altering the results of the case." But, again, the trial court reasonably found these RFAs related to trespass, not nuisance. Further, the fact that there was enough evidence for the nuisance claim to proceed did not mean they had proven anything for costs of proof purposes. (See *Stull*, *supra*, 92 Cal.App.4th at pp. 865–866 ["Proof is something more than just evidence. It is the establishment of a fact in the mind of a judge or jury by way of evidence. [Citation.] Until a trier of fact is exposed to evidence and concludes that the evidence supports a position, it cannot be said that anything has been proved."].)

Second, the trial court found that RFAs 7, 20, 21, and 28 related to the " 'natural flow' of water from [the Jarecki] property"; the "jury made no findings" on the issue; and the testimony in the Jareckis' separate statement did not suffice to show they proved these facts. The Jareckis contend they secured a nuisance verdict and the court had "authority to determine" if they

51

proved the facts at issue, citing *Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724 (*Garcia*).

The trial court did not err. Because the nuisance claim was decided by the jury, whether specific facts were proved turned on the jury findings or lack thereof. (*Stull*, *supra*, 92 Cal.App.4th at pp. 865–866.) *Garcia* was resolved on nonsuit, and is otherwise distinguishable. (*Garcia*, *supra*, 28 Cal.App.4th at pp. 734–735 [affirming *grant* of costs of proof in action involving equipment injury to employee that ended in nonsuit for manufacturer; employer's insurer denied negligence, despite strong evidence to the contrary (including admission by insurer's expert), and nonsuit rested on negligence evidence].)

The Jareckis also argue they proved the RFA facts here. We disagree. RFA 7 stated, "The [Jarecki Property] had not been unreasonably altered resulting in interference with the natural flow of surface water prior to February 3, 2010." RFAs 20, 21, and 28 asked about "block[ing] the natural flow of water" from the Jarecki property, doing so unreasonably, and diverting rain water. Natural flow questions were not before the jury, much less proven in the Jareckis' favor. As his deposition excerpts showed, Edward acknowledged during pretrial discovery that he left no drainage ports in the wall (but rather relied on the gap), and the wall blocked water flow. (Cf. *Wagy v. Brown* (1994) 24 Cal.App.4th 1, 6 (*Wagy*) [reversing costs of proof where defendant admitted negligence "for purposes of arbitration," thus "obviating the necessity for proof on that issue"].) At trial, the trial court noted the defense theory that "drainage was altered." Then, in their verdict form, the jury found the Jareckis altered the water flow in question 4 (before answering "no" to whether the Zitters' conduct was reasonable, in question 5). Natural flow was not mentioned on the form.

52

The Jareckis maintain RFA 7 relates to question 4, but the jury found in the *Zitters*' favor there. For RFAs 20, 21, and 28, they argue they put on testimony that the wall "blocked the water" (citing Edward's deposition testimony); question 5 asked about it; and the jury answered "no." None of this shows they proved anything at trial regarding natural flow.

Third, the trial court found the Zitters "partially admit" RFAs 29, 31, and 64, and nothing in the Jareckis' separate statement showed they proved non-admitted facts on these matters or on RFAs 45, 48, or 49. The Jareckis claim they "proved the truth of the matters sought" by RFAs 29, 31, and 64, but they only address RFA 31 in their opening brief. They do not address RFA 29 until their reply brief, or RFAs 45, 48, 49 and 64 at all, and we deem any such challenges forfeited. (*Raceway*, *supra*, 2 Cal.5th at p. 178; *Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.)

We thus focus on RFA 31, which stated: "[You] constructed the wall . . . without a means for surface waters to pass through the wall." The Zitters responded, "Admit as to altered, unnatural surface waters." The Jareckis cite Edward Zitter's deposition testimony about not leaving drainage ports in the wall, and contend this was "tantamount to a confession that his responses to the [RFAs] were deceptive, which forced the Jareckis to prove that he did in fact create the wall without any drainage ports." We disagree the RFA response to RFA 31 was deceptive, or that the deposition testimony supports costs of proof. The Zitters partially admitted the RFA, qualifying only what water was impacted (i.e., altered waters), not the physical structure of the wall. The jury's finding that the Jareckis had altered the water flow reflects this qualification was at least reasonable. As for Edward's acknowledgment of the wall structure at his deposition, that further precluded costs of proof,

because it confirmed the fact did not need to be proven at trial. (*Wagy*, *supra*, 24 Cal.App.4th at p. 6; *Stull*, *supra*, 92 Cal.App.4th at p. 864.)

Fourth, for RFAs 30 and 35, the trial court explained the RFAs asked for the Zitters' "knowledge of rain water pooling on [the Jareckis'] property"; the separate statement cited trial testimony from John Jarecki; and the Jareckis failed to show this proved the Zitters' knowledge. The Jareckis do not address this ruling, and cannot establish the court abused its discretion in this regard. (*Badie*, *supra*, 67 Cal.App.4th at pp. 784–785.) The court also found the Zitters had reasonable grounds to deny RFAs 30 and 35, and the Jareckis do dispute this ruling. Even if this were sufficient to preserve the issue, we would not be persuaded.

When the reasonable ground exception is at issue, a court " ' "may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial." ' " (*Grace*, *supra*, 240 Cal.App.4th at p. 529; see *Orange County Water Dist. v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96, 119 [issues for consideration include substantiality of evidence, "efforts to investigate the issue," and "state of discovery"].)

RFA 30 said: "After February 3, 2010, rain waters pooled on the [Jarecki Property]," and RFA 35 said, "Water pooling on the [Jarecki Property] interfered with the use of the property." The Zitters denied both. The issue presented was not simply whether there was any water accumulation, but whether there was "pool[ing]" to the point that it interfered with the Jareckis' use of their property—that is, to the point of being a nuisance. In denying there was pooling or interference from it, the Zitters were essentially asserting their litigation position that they had *not* created a ponding nuisance.

54

The record reflects the consistency of the Zitters' position, and that they had evidence for it. Edward Zitter did acknowledge at deposition that he saw pools of water on the Jarecki property after he built the wall—which obviated the need to prove that discrete fact, but also did not undermine his reasonable belief that this was not pooling or interference for nuisance purposes. The Zitters' counsel then advised the court before trial that expert Newsom would testify about the limited scope of the puddling or ponding; not only did he do so, but John Jarecki provided similar testimony. Thus, the Zitters' reasonable belief was based on the evidence, not on "hope or a roll of the dice." (*Grace*, *supra*, 240 Cal.App.4th at p. 532; cf. *id.* at p. 533 [affirming trial court finding that defendant "could rely on [expert's] opinion and reasonably deny both the extent of plaintiff's injuries and the necessity of . . . medical treatment"]; *Brooks*, *supra*, 179 Cal.App.3d at pp. 512, 513 [affirming denial of costs for RFA where plaintiff "had a reasonable basis, the anticipated testimony of his father" for denying it].)

The Jareckis maintain the Zitters' denials were unreasonable. For RFA 30 (pooling), they cite Edward's deposition testimony and Newsom's acknowledgement of the puddling. This evidence does not support costs of proof, for the reasons discussed above. For RFA 35 (interference from pooling), they cite John's testimony about the moss growth. This evidence focuses on the moss, not the pooling; does not establish the Zitters knew about it; and, even if they had, the Zitters could still reasonably believe that neither the minor water accumulation, nor the moss, amounted to nuisance-level interference.

In sum, the trial court could fairly conclude the Zitters had a reasonable, good faith belief when they denied RFAs 30 and 35 that they would prevail at trial on these matters (to the extent the existence of pooling

even remained a disputed issue). (*Grace, supra*, 240 Cal.App.4th at p. 529; see, e.g., *Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 904 [plaintiff sued companions for, inter alia, negligence and assault, after falling off cliff while intoxicated; denying costs of proof, in part, where court did not exceed bounds of reason in concluding he reasonably believed he would prevail].)[11]

c.      *Denial for Lack of Specific Accounting*

Finally, the trial court also denied costs of proof because the Jareckis failed to submit the required " 'specific accounting of costs or fees incurred' in proving the admissions at issue," citing *In re Tobacco Cases II* (2015) 240 Cal.App.4th 779 (*Tobacco Cases II*) and *Garcia, supra*, 28 Cal.App.4th 724. The court found their attorneys "fail to segregate their time spent on issues related to water flow (relevant to the nuisance claim) and survey or boundary issues (relevant to trespass)." It also found they "fail to segregate expert fees," noting Coffey's invoices "do not sufficiently delineate . . . work on water flow issues (nuisance claim)" and "boundary dispute/survey issues (trespass claim)." Additionally, it noted they did not "adequately segregate time and costs" for "the unsuccessful missing marker trespass claim."

The Jareckis argue the court's legal authorities are distinguishable, and its findings erroneous. These arguments are not persuasive.

First, the trial court cited applicable authorities. Recoverable costs of proof are "the reasonable expenses incurred in making that proof . . . ."

---

11      We have a further comment here. Neither party addressed the pretrial "[Proposed] Joint Trial Readiness Conference Statement," which included certain matters as "legal issues no longer in dispute," including that the footing encroached by 3 1/8 inches, the wall "blocks the natural flow of surface water," and the wall was built "without . . . drainage." Because the Jareckis do not show the trial court's merits rulings were an abuse of discretion, we need not consider this statement further.

(§ 2033.420, subd. (a).) "Plaintiffs must show they spent the amounts claimed to prove the issues defendants should have admitted. [Citations.] The requested amounts must be segregated from costs and fees expended to prove other issues." (*Grace, supra*, 240 Cal.App.4th at p. 529.)

In *Tobacco Cases II*, this court affirmed a denial of costs of proof, where the plaintiffs " 'failed to provide any specific accounting of costs or fees . . . .' " (*Tobacco Cases II, supra*, 240 Cal.App.4th at p. 807.) But we observed the trial court there "also noted [the] plaintiffs 'will have a difficult time parsing out what evidence . . . could only be attributed to the [RFAs] at issue,' " as the issues were " 'inextricably intertwined' " with others in the case. (*Id.* at pp. 807–808.) Although the Jareckis did provide documentation, the trial court found it was inadequate—for not parsing out the time attributable to the RFAs here.

As for *Garcia*, costs of proof were remanded for recalculation, where the trial court accepted the counsel's claimed costs for "expenses associated with the trial . . . and proving those [RFAs]," and his declaration failed to state his "hourly fee or any accounting of time" on the case. (*Garcia, supra*, 28 Cal.App.4th at pp. 736–737, italics omitted.) The reviewing court explained the "statute authorizes only . . . expenses 'incurred in making that proof' "; counsel "likely devoted at least some resources" to other issues; and "[n]othing in the bare-bones showing . . . reflects that any consideration was given to the fact that . . . trial preparation might extend beyond those areas covered in the [RFAs]." (*Ibid.*; *id.* at p. 737 [trial court relied on "conclusionary statement of counsel"].) Here, the Jareckis similarly relied on a conclusory attorney declaration, along with time summaries that did not sufficiently delineate work on separate issues.

Second, the Jareckis do not establish the court erred by finding their showing was inadequate. They contend their documentation reflected "time . . . attributable to cost of proof of the matters denied, and related proceedings that . . . contributed . . . to the preparation to prove those matters, for instance litigation to obtain the defendant's expert discovery." They further contend that the "time to try the case, and a part of the time to prepare the case[,] was charged," and "to the extent possible," they "segregated amounts not related to proving the denied [RFAs]." The lack of specificity is notable. They do not set forth a single example of a time entry that was impossible to segregate—even where the trial court identified an area of concern (e.g., expert Coffey's invoices). Rather, they just cite the attorney declaration, and lengthy attorney time record, filed below.[12]

## DISPOSITION

The amended judgment is modified by striking the award of punitive damages, and as so modified is affirmed. We deem the order reducing punitive damages moot, and affirm the orders taxing expert witness costs and

---

[12] On reply, the Jareckis maintain no apportionment was needed, citing a case with costs of proof on a single issue, and one about intertwined attorney fees. (*Assoc. for L.A. Deputy Sheriffs v. Macias* (2021) 63 Cal.App.5th 1007, 1030–1031 [costs of proof did not need allocation to each RFA; "virtually all the requests relate to a single issue"]; *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 417 ["[a]pportionment is not required when the issues in the fee and nonfee claims are so inextricably intertwined that it would be impractical or impossible"].) The single issue case is distinguishable, and even assuming the fee case applies here, they have not established they were incapable of segregating costs.

denying costs of proof.  The Zitters shall be awarded their costs for their appeal and for the Jareckis' cross-appeal.


BUCHANAN, J.

WE CONCUR:


DO, Acting P. J.


CASTILLO, J.